**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Oct 31 2012, 9:07 am

CLERK
of the supreme court,
court of appeals and
tax court

APPELLANT PRO SE:

**TIMOTHY A. STEVENS**
Westville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**NICOLE M. SCHUSTER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| TIMOTHY A. STEVENS, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 64A03-1111-PC-525 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE PORTER SUPERIOR COURT
The Honorable Raymond D. Kickbush, Senior Judge
Cause No. 64D05-1005-PC-5208

**October 31, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**NAJAM, Judge**

## STATEMENT OF THE CASE

Timothy A. Stevens appeals the post-conviction court's denial of his petition for post-conviction relief following a hearing. He presents six issues for review, which we consolidate and restate as:

1. Whether Stevens received ineffective assistance of trial counsel.

2. Whether Stevens received ineffective assistance of appellate counsel.

We affirm.

## FACTS AND PROCEDURAL HISTORY

The facts underlying Stevens' petition for post-conviction relief were set out in his direct appeal from his conviction for three counts of aiding in theft, as class D felonies, and two counts of bribery, as Class C felonies:

> In the summer of 2006, Stevens informed his uncle, Kenneth Campbell, and his cousin, Maranda Campbell (Kenneth's daughter), that he had thirteen American Express travelers checks that he needed to cash. Stevens explained that he did not have proper identification to cash the checks himself because his license had been confiscated when he tried to cash one of the checks at his own bank. Each travelers check was in the amount of $500. Stevens told Kenneth that he received the checks through an internet advertisement from a company purportedly located in the United Kingdom. Stevens kept the checks in a Fed-Ex envelope that was addressed to "Steve Timmons[,]" a name Kenneth believed to be Stevens's alias. Transcript at 153.
>
> Kenneth refused to cash the checks for Stevens, but Maranda agreed. Maranda suggested to Stevens that they cash the checks at Wal-Mart. Maranda had confirmed that Wal-Mart would cash a travelers check with a small purchase and she also knew how things operated because she once worked at Wal-Mart. For Maranda's help, Stevens agreed to give her $100 (minus amounts for purchases made) for each $500 check she cashed. Although Kenneth told Stevens that he would not help, he accompanied Maranda and Stevens each time they went to cash a check to ensure Maranda's safety. Kenneth remained in the vehicle while Stevens and

2

Maranda went to cash the travelers checks. Kenneth received no money after the transaction was complete.

Stevens and Maranda went to several Wal-Mart stores, including three in Porter County. They used the same method each time they cashed a check. Stevens and Maranda would meet in the parking lot and discuss what item she would buy in order to cash the check. Stevens would hand a check to Maranda just as they entered the store. Maranda would make the purchase and receive cash for the remaining value of the check from the cashier. Stevens accompanied Maranda at all times and was near her as she checked out. Stevens and Maranda would then walk out together, and while in the parking lot, Maranda would give Stevens the cash she had received. Stevens would then pay Maranda her share. They would then leave in separate vehicles. Stevens and Maranda repeated this plan approximately every other day for a two- to three-week period. They spaced their visits so as not to draw attention to themselves for cashing so many checks. They also went to different Wal-Mart locations because "it just seemed more convenient to avoid the risk of being caught." Id. at 74. After one of the check-cashing episodes, Stevens purchased crack cocaine and shared it with Maranda and Kenneth.

Wal-Mart sent the travelers checks to the bank, and each check was dishonored and retuned with a "counterfeit" stamp across the front. Id. at 23. Jerry Waggle, a Wal-Mart employee working in asset protection, testified that each time one of the $500 travelers checks was dishonored, Wal-Mart was "out the $500." Id. at 39. In other words, the items purchased and the cash paid to Maranda each time a travelers check was cashed and subsequently dishonored was a loss for Wal-Mart. After conducting its internal investigation, Wal-Mart submitted the information it had gathered to the police. The police investigation led to Maranda as the individual cashing the dishonored checks. Maranda was ultimately arrested, charged, and convicted of theft for her part in the check-cashing scheme.

While Maranda was serving her time in jail for her involvement, Stevens wrote her a letter and sent it to her grandmother's address. Maranda did not immediately receive the letter because she was incarcerated. The letter was passed from her father (Kenneth) to her brother, and finally to her mother. Before Maranda learned of the letter, she received another letter from Stevens.[FN] Maranda was confused by the second letter until her mother informed her of some of the contents of the first letter sent by Stevens, at which time, "the pieces . . . fell together" for Maranda. Id. at 82. The first letter, which is eight, hand-written pages, states in relevant part:

Needless to say—or maybe it needs to be said: I recently got the State's discovery from our case here in Porter County. And I think this opportunity has now shifted from Ken to you. Call it eliminating the middle man, or whatever you want but I was stressing the importance to Ken on at least making you a little more comfortable is the least I/we can do so it's kind of like winning $1,000 lottery & I will personally deliver or send it to wherever you want but I assume "on your books" would be most helpful for commissary, etc. Like I said, there's a cash bond here a $2,000.00 cash bond in Lake Co. (in my name). I have to pay this money (along with a lot more) back to my dear friend who has been helping me. But then again, you also deserve a piece of the pie rather than these greedy worthless attorneys since you're doing the real suffering . . . .

* * *

It's really pretty simple: 1) I was never with you at any Wal-Marts [it's not like you said I was, but I did] 2) You kept all money received 3) You thought they were authentic, "real"— and you did say that. Therefore, there's no knowing and willing intent.

I believe this is set for jury selection on 4/7 & trial on 4/9 so you can expect to be subpoenaed (or at least taken out that day). That is, unless you have any reservations. I would need to know so that we're in agreement. And there is no possibility of perjury charges or anything. After all, they already found several inconsistencies in your statement but cannot prosecute.

* * *

One other thing. You were given those (or took or stole) from Ken. Maybe he was looking for work on the internet too or found them or whatever. There's no crime there—no criminal intent in just having possession of them. It makes logical sense to me, for example, that Ken got them off the internet. . . .

* * *

4

And I would not just leave you thrown out to the wolves which is how it seems, ain't it? I just wish that you would have contacted me when the cops first got ahold [sic] of you & we could have approached this whole thing differently—and possibly avoided convictions. A guy told me months ago that it would be a mistake to work against each other because nobody wins (except maybe the State, but not really) & ultimately, like Ken was saying, the real criminals remain free!

So now what I'm trying to do is "paint a picture" of me having decided to take the fall for my terminally-ill [sic] uncle in an attempt to keep him in a position to care for his elderly, dependent mother . . . .

[Footnote: Stevens sent this . . . letter through the same channels as he did the first. The second letter, however, was received by Maranda's grandmother, who then forwarded the letter to Maranda while she was incarcerated.]

State's Exhibit 5a. After being informed of this letter, Maranda contacted the police because she believed Stevens was trying to implicate Kenneth. The second letter Maranda received instructed her to contact one of Stevens's friends who would tell her what to say at Stevens's trial. Maranda, however, never contacted Stevens's friend. Maranda received nothing from the State in exchange for her testimony in Stevens's trial.

Kenneth also received a letter from Stevens. In this letter, Stevens discussed Maranda's testimony. Stevens wrote:

Honestly, I have no idea why your daughter admitted to suspecting the money orders were no good. Except, of course, perhaps her representation. That's why I had her set to be a witness for trial—which was supposed to be next week. First of all, as an incentive to recant part of her testimony (because she already plead [sic] guilty and was sentenced) I offered her $1,000 which is of the $1500 cash bond here [and $2000 in Lake Co]. Even though I have to pay back my friend this money, like I told her, I'd rather pay her—or you—than an attorney! The upshot is an acquittal & the downside is the time served [at 5 months now] with no bond. Needless to say, I'll pay you the same—and I'm negotiable if more is expected for your testimony because, frankly, now that the dates were changed whenever I go back

> in, say, 2-6 weeks & the State offers me a 6-month time served plea—and I have no witnesses—then I really have no choice but to accept. Anyway, I had sent [Maranda] an 8-page letter months ago and basically said that if I heard nothing I.d [sic] assume she was in agreement.

State's Exhibit 9 at 3-4. Stevens continued to address the charges pending against him. Near the end of the letter, Stevens stated, "But I would need you man" and indicated that there would be "another opportunity" because he needed Kenneth's help in a pending criminal case in Lake County. Id. at 7. Although Kenneth was confused by the letter, he ultimately concluded that Stevens was trying to tell him how to testify.

> On March 28, 2007, the State charged Stevens by information.[] On May 19, 2008, the State filed its third amended information charging Stevens with three counts of class D felony aiding in theft (Counts I, II, and III) and two counts of bribery (Counts IV and V). A jury trial was held on August 28, 2008, at the conclusion of which the jury found Stevens guilty as charged. At a December 2, 2008 sentencing hearing, the trial court sentenced Stevens to two years on each of Counts I, II, and III, four years on Count IV, and six years on Count V. The trial court ordered the sentences on the three counts of aiding in theft and the sentence on Count IV be served concurrently. The court ordered the sentence on Count V to be served consecutive to the others, for a total aggregate sentence of ten years.

Stevens v. State, 913 N.E.2d 270, 272-75 (Ind. Ct. App. 2009) (some alterations in original), trans. denied ("Stevens I"). We affirmed Stevens' convictions on three counts of aiding in theft, as Class D felonies, and two counts of bribery, as Class C felonies. Id. at 280.

On March 14, 2011, Stevens filed a pro se petition for post-conviction relief. On August 5, the post-conviction court held a hearing on the petition. And on October 13, the court denied post-conviction relief. Stevens now appeals.

# DISCUSSION AND DECISION

## Standard of Review

In post-conviction appeals, our standard of review is well established:

> [T]he petitioner bears the burden of establishing grounds for relief by a preponderance of the evidence. Ind. Post-Conviction Rule 1(5); <u>Henley v. State</u>, 881 N.E.2d 639, 643 (Ind. 2008). When appealing the denial of post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment. <u>Henley</u>, 881 N.E.2d at 643. The reviewing court will not reverse the judgment unless the petitioner shows that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. <u>Id.</u> at 643-44. Further, the post-conviction court in this case made findings of fact and conclusions of law in accordance with Indiana Post-Conviction Rule 1(6). We will reverse a post-conviction court's findings and judgment only upon a showing of clear error, which is that which leaves us with a definite and firm conviction that a mistake has been made. <u>Id.</u> at 644. The post-conviction court is the sole judge of the weight of the evidence and the credibility of the witnesses. <u>Fisher v. State</u>, 810 N.E.2d 674, 679 (Ind. 2004). We accept findings of fact unless clearly erroneous, but we accord no deference to conclusions of law. <u>Id.</u>

<u>Taylor v. State</u>, 929 N.E.2d 912, 917 (Ind. Ct. App. 2010), <u>trans. denied</u>.

Stevens' request for post-conviction relief is premised on his contentions that he was denied the effective assistance of trial and appellate counsel in violation of the Sixth Amendment to the United States Constitution. A claim of ineffective assistance of counsel must satisfy two components. <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). First, the defendant must show deficient performance: representation that fell below an objective standard of reasonableness, committing errors so serious that the defendant did not have the "counsel" guaranteed by the Sixth Amendment. <u>Id.</u> at 687-88. Second, the defendant must show prejudice: a reasonable probability (i.e., a probability sufficient to

7

undermine confidence in the outcome) that, but for counsel's errors, the result of the proceeding would have been different. Id. at 694.

We presume that counsel provided adequate representation. Sims v. State, 771 N.E.2d 734, 741 (Ind. Ct. App. 2002), trans. denied. "Counsel is afforded considerable discretion in choosing strategy and tactics, and we will accord that decision deference." Id. Furthermore, a petitioner must show more than isolated poor strategy, bad tactics, a mistake, carelessness or inexperience. Law v. State, 797 N.E.2d 1157, 1162 (Ind. Ct. App. 2003). As to prejudice, "there must be a showing of a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

**Issue One: Effective Assistance of Trial Counsel**

Stevens first contends that he was denied the effective assistance of trial counsel, Anthony Bertig and Bryan Truitt,[1] because one or both of them: (1) failed to file with the court an exhibit list prepared by Stevens; (2) failed to present Stevens' requested defense theory at trial; and (3) failed to request a continuance after the State introduced an "evidentiary harpoon" at trial. Appellant's Brief at 12. We address each contention in turn.

We first consider Stevens' contention that his trial counsel failed to file the exhibit list Stevens had prepared for trial and failed to present the defense theory Stevens requested. Specifically, Stevens contends that he inadvertently submitted his self-

---

[1] Truitt represented Stevens at a pre-trial hearing, and Bertig represented him at the trial.

prepared exhibit list for trial with the prosecutor's office instead of with the court, that he asked trial counsel to file the same with the court, but trial counsel failed to do so. Stevens also contends that his trial counsel refused to present his defense theory that he had given a false confession in order to protect his uncle and that he had been unaware that the travelers checks were counterfeit.

But at the post-conviction hearing, Bertig testified that presenting the evidence on Stevens' exhibit list would have been "more harmful than helpful" to Stevens' case. Post-Conviction Transcript at 35. In other words, Bertig exercised his professional judgment when he decided not to use the exhibits on Stevens' list. Nor has Stevens shown that Bertig's decision not to present Stevens' defense theory at trial was anything other than trial strategy. Stevens elicited no testimony from Bertig on this point at the post-conviction hearing. But his proposed theory was that he had made a false confession to protect his uncle. Other evidence, namely the letters he had written to his uncle and cousin Maranda, directly contradict that theory. Thus, Stevens' proposed defense theory would have undermined his credibility. Stevens has not shown that these professional decisions were in error, let alone that they were more than isolated poor strategy, bad tactics, a mistake, carelessness or inexperience. See Law, 797 N.E.2d at 1162.

We next consider Stevens' contention that his trial counsel was ineffective for failing to request a continuance after the State introduced an "evidentiary harpoon" at trial. In particular, Stevens argues that the State played a recording of a jailhouse phone call he had with his mother, in which his mother said that the counterfeit checks had

9

come from Stevens. On appeal Stevens contends that his trial counsel was ineffective because he did not seek a continuance after the "erroneous admission of hearsay testimony[.]" Appellant's Brief at 12. But Stevens did not raise the failure to request a continuance as error in his petition for post-conviction relief. Nor does he show by citation to the transcript that he argued this point at the post-conviction hearing. And neither does Stevens explain how his own statements offered against him are hearsay. See Ind. Evidence Rule 801(d)(2). Therefore, the issue is waived. See P-C.R. 1(8); Ind. Appellate Rule 46(A)(8)(a).

### Issue Two: Effective Assistance of Appellate Counsel

Stevens also contends that he received ineffective assistance of appellate counsel. Specifically, he maintains that his appellate counsel was ineffective because she failed to raise certain issues on direct appeal. We address each issue in turn.

We first consider Stevens' contention that his appellate counsel was ineffective because she failed to raise in his direct appeal the "motion for a new trial issue." Appellant's Brief at 13. But Stevens does not cogently explain what the "motion for new trial issue" is. Thus, this issue is waived. See Ind. Appellate Rule 46(A)(8)(a). Waiver notwithstanding, even if we were to assume that the failure to raise that issue were error, Stevens has not shown a reasonable probability (i.e., a probability sufficient to undermine confidence in the outcome) that, but for counsel's errors, the result of the proceeding would have been different. See Strickland, 466 U.S. at 694. Therefore, he has not shown ineffective assistance regarding the "motion for a new trial issue."

Similarly, Stevens asserts as a separate issue that his appellate counsel was ineffective because she did not "raise the issue of denial of [an] evidentiary hearing on [a] motion for a new trial[.]" Appellant's Brief at 14. But, again, Stevens does not demonstrate how the result of his direct appeal would have been different if the issue had been raised. Thus, again, he has not demonstrated ineffective assistance of appellate counsel. See Strickland, 466 U.S. at 694.

Finally, Stevens contends that his appellate counsel was ineffective because she did not raise in the direct appeal two additional issues: the "evidentiary harpoon" issue and a "fatal variance" issue. But Stevens did not assert either of these claims in his petition for post-conviction relief. Therefore, they are waived. See P-C.R. 1(8).

## Conclusion

Stevens has not shown that he received ineffective assistance of trial counsel or appellate counsel. As such, we affirm his convictions on three counts of Class D felony aiding in theft and two counts of Class C felony bribery.

Affirmed.

KIRSCH, J., and MAY, J., concur.